Frank D. and Mary Scotten v. Commissioner.
Scotten v. Commissioner
Docket Nos. 4531-62, 6183-65.
United States Tax Court
T.C. Memo 1966-206; 1966 Tax Ct. Memo LEXIS 77; 25 T.C.M. (CCH) 1054; T.C.M. (RIA) 66206; September 23, 1966
Towner Leeper, Southwest Nat'l Bank Bldg., El Paso, Tex., for the petitioners. Ralph V. Bradbury, Jr., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated cases respondent determined that petitioners had the following deficiencies and addition to tax: Addition
to Tax
Taxable
Docket
Defi-
Sec. 6653(a),
Year
No.
ciency
1954 Code
1960
4531-62
$2,010.08
$100.50
1961
6183-65
1,561.22
1962
6183-65
$1,589.98
1963
6183-65
1,184.33
*78 The issues presented for our decision are: 1. Was petitioner Frank Scotten "away from home" when he was on business trips for his employer during the years involved so as to permit him to deduct traveling expenses under section 162(a)(2), Internal Revenue Code of 1954? 2. If petitioner Frank Scotten was not "away from home" during the years involved, was he entitled to deduct amounts expended while on business trips in excess of ordinary costs of living? 3. What amount of automobile operating expenses and automobile depreciation was petitioner Frank Scotten entitled to deduct during the years in question? 4. Was at least a part of the underpayment for the taxable year 1960 due to negligence within the meaning of section 6653(a), Internal Revenue Code of 1954? Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein and made a part of our findings by this reference. Frank D. Scotten (hereinafter called petitioner) and Mary Scotten (hereinafter sometimes called Mary) are husband and wife now residing in El Paso, Texas. They filed *79 their joint Federal income tax returns for the years 1960 through 1963 with the district director of internal revenue at Austin, Texas. Petitioner Mary Scotten is a party to this proceeding only because she filed joint income tax returns with her husband. Petitioner was born in 1896 in Phoenix, Arizona. Shortly thereafter his family moved to El Paso, Texas, where he was reared and educated through high school. For most of the time until 1937 the petitioner lived and worked in El Paso, interrupted primarily by distinguished military service in World War I. In 1937, petitioner went to work for the American City Bureau, Inc., of Chicago, Illinois, with whom he remained until his retirement in October 1963. However, the petitioner started working again for American City Bureau in 1964. American City Bureau is the oldest and largest firm in the United States engaged in furnishing counsel to various organizations concerned with raising funds. Its clients consist of philanthropic agencies such as churches, hospitals, youth agencies, United Funds, schools, and other non-profit organizations. Petitioner was a campaign director for American City Bureau during the four years involved *80 herein. He worked under annual contracts. The following is a copy of the type of contract entered into by petitioner and American City Bureau for each of the years 1960 through 1963: REGULAR EMPLOYMENT AGREEMENT (Continuing Staff) AMERICAN CITY BUREAU, INC. TO: IN CONSIDERATION of the mutual agreements herein, American City Bureau, Inc. hereinafter called "the Employer" hereby retains your services for the calendar year 19 on the following basis: YOU AGREE: (1) To undertake and to use your best efforts in the performance of such duties as may be assigned to you. (2) To remain available and willing at all times to accept assignments in any geographic location. (3) The Employer may terminate this agreement at any time for incompetence, immoral or unbecoming conduct which tends to bring the Employer or any of its clients into disrepute. The Employer shall be the sole judge of the existence of such incompetence, immoral or unbecoming conduct. AMERICAN CITY BUREAU, INC. AGREES: (4) To pay you for your services performed in accordance with this agreement a salary of $ a month, in twenty-four semimonthly installments. (5) To pay your traveling expenses to all points *81 to which you are assigned for service, including the annual company training conference, in keeping with the established practice and announced schedules of the Employer for the year of this contract. In addition, if your wife accompanies you on field assignments, her expenses will be paid by the Employer in keeping with the established practice and announced schedules of the Employer for the year of this contract. (6) That should your death occur while this contract is in effect, the Employer will pay your surviving spouse $2500 in $100 monthly installments, commencing with the month following that in which your death occurs and continuing until the death of your spouse or complete payment, whichever shall first occur. ACCEPTED BY: Employee Dated AMERICAN CITY BUREAU, INC.
By Dated Petitioner's duties were dual in nature. First, he made sales calls in an attempt to secure client contracts for American City Bureau. Second, he serviced client contracts where he furnished the fund raising counsel contracted for between American City Bureau and the client. The client contracts serviced by the petitioner might or might not have been contracts he obtained while making sales *82 calls. When working on sales calls, petitioner was reimbursed for all his expenses including meals and lodging. He was also paid mileage from the time he left El Paso until he returned to El Paso. When servicing client contracts, petitioner was reimbursed for all his expenses for meals and lodging on the road. He was also paid mileage en route from El Paso to his assignment and, at the conclusion of the assignment, he was reimbursed for these same expenses en route back to El Paso. The difference between the reimbursement on the two types of assignments was that while at the place of the client contract assignment the petitioner bore his own expenses for meals and lodging and other items. In addition, when his wife accompanied him on field assignments, her expenses were paid by American City Bureau in keeping with its established practice and announced schedules. When in Chicago for meetings, all of petitioner's expenses including meals and lodging were paid for by the company. Contracts ran for a set period of time, usually six weeks to three months. Since the petitioner frequently did not return to El Paso at the conclusion of an assignment but would go directly to another assignment, *83 he was reimbursed in these instances for his expenses for meals, lodging, and mileage between assignments. American City Bureau required a detailed written expense report as a basis for all reimbursements to the petitioner. The following schedule reflects the itinerary of the petitioner for each of the four years involved. 1960
1/ 1- 4/24/60
Sales calls
4/25- 7/24/60
Client contract assignment - Lin-
coln Lutheran Home, Racine,
Wisconsin
7/25- 7/31/60
Sales calls
8/ 1- 8/ 7/60
Staff conference in Chicago, Il-
linois
8/ 8- 8/28/60
Vacation
8/29-10/ 9/60
Client contract assignment -
United Fund of Porter
County, Valparaiso, Indiana
10/10-11/13/60
Client contract assignment -
Greater Macomb Community
Chest, Macomb, Illinois
11/14-12/21/60
Client contract assignment - In-
dustrial Fund, Olney, Illinois
12/22-12/31/60
Unassigned
1961
1/ 1- 1/ 2/61
Unassigned
1/ 3- 1/17/61
Client contract assignment - Cor-
dell Memorial Hospital, Lib-
ertyville, Illinois
1/18- 6/18/61
Client contract assignment - St.
Joseph's Hospital, Marshfield,
Wisconsin
6/19- 7/23/61
Vacation
7/24- 8/13/61
Unassigned
8/14- 9/17/61
Client contract assignment -
Guidance Village, Inc., Boga-
lusa, Louisiana
9/18-11/26/61
Client contract assignment - In-
dustrial Fund, Jackson, Mis-
sissippi
11/27-11/30/61
Sales calls
12/ 1-12/26/61
Client contract assignment - Proj-
ect 330, Inc., Aurora, Illinois
12/27-12/31/61
Staff conference in Chicago, Il-
linois
1962
1/ 1/62
Staff conference, Chicago, Illi-
nois
1/ 2- 2/28/62
Client contract assignment -
Project 330, Inc., Aurora,
Illinois
3/ 1- 3/ 3/62
Unassigned
3/ 4- 5/26/62
Client contract assignment - Cal-
umet Memorial Hospital, Phil-
ton, Wisconsin
5/27
Unassigned
5/28- 8/31/62
Client contract assignment -
Hess Memorial Hospital, Assn.,
Inc., Mauston, Wisconsin
9/ 1-10/21/62
Vacation
10/22-12/22/62
Client contract assignment -
Alexian Bros. Hospital, Chi-
cago, Illinois
12/23-12/31/62
Unassigned
1963
1/ 1- 4/ 5/63
Client contract assignment -
Alexian Bros. Hospital, Chi-
cago, Illinois
4/ 6- 4/14/63
Unassigned
4/15- 7/19/63
Client contract assignment - Riv-
erside Hospital, Waupaca,
Wisconsin
7/20- 9/ 8/63
Vacation
9/ 9-10/ 7/63
Client contract assignment -
Memorial Hospital of Taylor
County, Inc., Medford, Wis-
consin
10/ 8-12/31/63
Retired
*84 Petitioner performed no working assignments in El Paso for American City Bureau during any of the years 1960 through 1963. In servicing a contract obtained by the company, petitioner would travel to the local area and organize the fund raising effort. He would set up a plan or campaign, secure leadership and office mechanics, hire the clerical staff and obtain office facilities, telephones, secretaries, etc., and remain in that locale until the contract was completed. He would establish local headquarters and then work out of that headquarters through the various communities serviced by the particular organization for whom the campaign was being conducted. He would establish a campaign organization in each of the surrounding villages, towns or general areas that would be serviced by the charitable organization, make assignments in each, have meetings, and set up leadership. He would travel from one community to another on a planned schedule in order that everyone would know what they were supposed to do and when it was supposed to be done. In performance of such travel the petitioner would use his own automobile and pay his own expenses. American City Bureau's main office was in *85 Chicago, Illinois, from which the assignments of the petitioner and general management decisions originated. There were also sub-offices in New York City, New Orleans, Denver, and Sacramento. Petitioner's paychecks were issued from Chicago and deposited in his bank account in El Paso. While making either sales calls or servicing an existing contract, petitioner received no supervision from Chicago. While he was on the job, he was the director or senior counsel and it was his responsibility to complete the job satisfactorily. Until 1950 petitioner and his wife occupied a bedroom in his mother's home whenever they were in El Paso. In 1950 petitioner rented a home in El Paso where his wife and three daughters lived for five years. The children attended high school in El Paso and then went on to college. During the four years involved herein the three girls were adults who lived in California, Montana, and Austin, Texas. When the three children had all left home for college, petitioner gave up the rented home in El Paso and again began to use a bedroom in his mother's home whenever he was in town. He paid some of his mother's household expenses during such period. His wife accompanied *86 him on almost all his business trips once they gave up their rented home. When his mother died in 1956, petitioner made arrangements to use a bedroom in his brother's home in El Paso and paid some money toward his brother's household expenses. His brother died in 1959. Wilma C. Scotten (hereinafter called Wilma) is the widow of petitioner's deceased brother. During each of the taxable years involved herein, whenever the petitioners were in El Paso they stayed with Wilma at her home in El Paso. In these years the petitioners used Wilma's address as their mailing address and she forwarded their mail to them. Petitioners stored a steamer trunk in the basement of Wilma's home containing out-of-season clothing. The trunk was forwarded to the petitioners at the beginning of the summer and winter seasons and later returned to Wilma's home. Their linens were kept in a small trunk or suitcase stored in the basement of Wilma's house while their china was kept in the front bedroom closet in a box. Wilma has been a teacher in the public school system of El Paso for approximately 43 years. Because of her teaching duties she is away from home from Monday through Friday of each week during the *87 school year from approximately 8:00 a.m. until 4:30 p.m. It has been her habit to turn the utilities off during the day unless she has visitors in her home. After Wilma lost her husband in 1959, one or both of the petitioners constantly stayed at her home during the winter of 1959-1960. Mary was with Wilma by herself from early January to sometime in April, 1960. Thereafter through October 1963, the petitioners stayed in Wilma's home for short periods of time each year, generally not exceeding a week or ten days each time. On occasion Mary stayed with Wilma for a few nights when the petitioner was on an assignment. However, she almost always accompanied the petitioner on his trips. When they stayed with Wilma, the petitioners occupied the front bedroom of the three-bedroom home. About once a month a lady friend of Wilma's would visit her for a weekend. This guest occupied the front bedroom if petitioners were not there. Wilma prepared her own breakfast and left home for work in the morning during the week before the petitioners arose. Mary prepared their own breakfast and lunch and often prepared the evening meal for all three. During their vacations the petitioners spent some *88 time with each of their three children and with Wilma. While visiting in Wilma's home, the petitioners voluntarily gave her some money, usually somewhere between $20 and $25 per week. They also reimbursed Wilma for their long distance telephone calls and sometimes paid her paperboy and maid. During the period from January to April 1960, when Mary was with Wilma constantly, petitioners paid Wilma the following amounts: Date of
Notation on check
check
Amount
or check stub
Jan. 8, 1960
$ 40
Rent
Jan. 18, 1960
40
Rent
Jan. 20, 1960
10
Telephone call
Feb. 1, 1960
28
Rent and phone bill
Feb. 13, 1960
60
Rent to March 6
Mar. 7, 1960
41
Rent
Mar. 22, 1960
42
Rent and postage
Apr. 4, 1960
44
Rent to 17th
Apr. 18, 1960
41
Rent to May 1
The following checks of the petitioners were given to Wilma during the balance of 1960: Date of
Notation on check
check
Amount
or check stub
May 3, 1960
$ 11
May rent
June 1, 1960
10
June rent
June 7, 1960
100
Trip to Racine
Aug. 23, 1960
20
August and September
rent
Oct. 1, 1960
10
October rent
Nov. 1, 1960
10
November rent
Dec. 28, 1960
20
December and January
rent
*89 The June 7, 1960, check for $100 was sent by the petitioners to Wilma for a plane trip to Chicago, Illinois, where they met her and took her to Racine, Wisconsin, for a three-week visit there. Petitioner produced no cancelled checks at the trial for the years 1961, 1962 and 1963, and he could not estimate how much was paid to Wilma during such years since Mary wrote all checks. When the petitioners were not staying with Wilma at her home, they voluntarily sent her $10 each month until the petitioner retired. There was no oral or written agreement between the petitioners and Wilma with respect to this payment. Wilma understood that she was being sent the $10 for forwarding their mail and sending their trunk twice a year. Petitioners told Wilma to "just call it rent." Wilma informed petitioners that she did not wish to receive any money for their staying in her home and that she was willing to forward their mail and trunk to them without reimbursement. Wilma kept one of the checks several months before cashing it and sent another back to the petitioners. Wilma never charged the petitioners for anything she did for them. She never asked for more than was voluntarily paid her and she *90 kept the sums received at the insistence of petitioners. In October 1963, upon his retirement from American City Bureau, petitioner purchased a residence in El Paso, Texas, and has continued to occupy the house until the present time. Petitioners vote in El Paso, and have done so for many years. They maintained their bank account at the State National Bank in El Paso and have their bank statements sent to 3130 Aurora in El Paso. The address shown on their checks is 3130 Aurora, El Paso, Texas. Their automobiles were registered in El Paso County and their license plates were acquired at the County Courthouse there. They borrowed money from El Paso banks to purchase cars and a house. Frank Scotten has been a member of the American Legion for forty-seven years. Among his other affiliations in El Paso are the Scottish Right, the York Right and the Shrine, in which he was Potentate. Petitioners have been members of El Paso churches. They have maintained their personal connection with friends in El Paso throughout the years. Petitioners claimed on their returns for each of the years in question the following expenditures: Description
1960
1961
1962
1963
Meals away from home
$1,306.15
$1,662.65
$1,918.35
$1,527.00
Lodging away from home
1,252.44
1,219.39
1,613.34
1,409.31
Tips
61.35
100.35
76.75
Telephone and telegraph
62.76
116.87
61.32
70.24
Miscellaneous
54.10
27.50
49.00
23.00
Professional services
51.00
70.00
Entertainment
131.75
Express
69.36
93.69
Totals
$2,736.80
$3,309.51
$3,858.12
$3,123.24
*91 Petitioners incurred the following automobile operating expenses and depreciation: 1960
1961
1962
1963
Operating expenses
$1,165.18
$1,505.57
$1,489.89
$1,490.42
Depreciation
674.34
1,089.95
1,232.45
1,232.45 Petitioners concede that at least 10 percent of their automobile expenses and depreciation in 1960, 1961 and 1962, and 25 percent in 1963 were for personal purposes. Respondent concedes that at least 31 percent of said amounts were for business purposes in each year. During the years 1960, 1961, 1962 and 1963 the petitioners received from American City Bureau the amounts of $539.11, $484.18, $414.72 and $772.32, respectively, as mileage reimbursements in connection with sales calls and client contract assignments. No part of any of the stated amounts were reported by the petitioners in their Federal income tax returns for such years. During the years 1960, 1961, 1962 and 1963 the petitioners received from American City Bureau the amounts of $2,372.05, $725.47, $220.34 and $520.63, respectively, as reimbursement for meals, lodging, tips and freight on personal belongings. Petitioners did not report these amounts as income nor deduct *92 the expenditures as expenses in their income tax returns. For the year 1960, in addition to the mileage reimbursement of $539.11 and the reimbursement for meals, lodging, tips and freight on personal belongings of $2,372.05, the petitioner received reimbursement for miscellaneous business expenses of $884.91, which amount is deductible but offset by the unreported reimbursement. In each of the years 1960, 1961, 1962 and 1963, petitioner did not report mileage reimbursement received from American City Bureau as a part of his gross income. The Commissioner determined that his failure to include mileage reimbursement in gross income on his 1960 return was negligent under the provisions of section 6653(a). A certified public accountant prepared the 1960 income tax return of petitioners. The accountant was told of the reimbursement and he concluded that its inclusion in gross income would only require the deduction of the same amount, i.e., a washout, so there was no need to include it in gross income on the 1960 tax return. No part of the underpayment was due to negligence or intentional disregard of rules and regulations. Opinion To qualify for a deduction under section 162(a)(2), [1] Internal Revenue Code *93 of 1954, the petitioner must show (1) that his expenses were ordinary and necessary, (2) that the expenses were incurred while he was "away from home," and (3) that he incurred the expenses in pursuit of business. Commissioner v. Flowers, 326 U.S. 465 (1946); Henry C. Deneke, 42 T.C. 981 (1964). Here the respondent only challenges whether his expenses were incurred while "away from home." We have often encountered the issue and have decided each case on its own facts and circumstances. Peurifoy v. Commissioner, 358 U.S. 59 (1958); George W. Lindsay, 34 B.T.A. 840 (1936). In some cases we have found that taxpayers literally carried their homes on their backs and were never *94 away from home. See Henry C. Deneke, supra (a traveling salesman); Wilson John Fisher, 23 T.C. 218 (1954), affirmed 230 F. 2d 79 (C.A. 7, 1956) (a professional musician); Moses Mitnick, 13 T.C. 1 (1949) (the manager of traveling theatrical companies); and Charles E. Duncan, 17 B.T.A. 1088 (1929), affirmed per curiam 47 F. 2d 1082 (C.A. 2, 1931) (a traveling salesman). The legislative history of the deduction for "away from home" expenses is sketchy and of little aid in determining what Congress meant by "home." However, in considering a similar problem, the Court in James v. United States, 176 F. Supp. 270 (1959), affirmed 308 F. 2d 204 (C.A. 9, 1962), said (p. 272): Congress did not exempt the usual living expenses of the taxpayer. We all share that burden equally. While the Government admits that there is little or no legislative history behind these sections, particularly as to the travel deduction provisions, it would appear that Congress must have reasoned in this manner: No person is permitted to deduct living expenses generally, and ordinarily people are employed in the *95 immediate vicinity of their home. However, there are certain employments which require the taxpayer to be and remain away from his home for extended intervals of time, during which period he is incurring additional and duplicitous expenses; that in order to equalize the burden between the "home" working person and the "away from home" working person an exemption should be granted as to the extent of travel expense, meals and lodging incurred by the "away from home" taxpayer to the extent that they are the ordinary and necessary expenses, incident to the "away from home" employment. [Emphasis supplied.] The Court of Appeals, in affirming the James case, pointed to two reasons for allowing a deduction for "away from home" traveling expenses: (1) to compensate for the duplication of expenses, and (2) to compensate for the inherently higher costs of food and shelter while traveling. Although a taxpayer must have a "home" to be away from, what is meant by "home" is sometimes difficult to determine. It often means different things. And, while the subjective intent of each taxpayer is one factor to be considered, the objective manifestations of such intent are important too. Surely *96 "home" is not simply where the heart lies. If this were true, it would open the floodgates for the deduction of all kinds of personal living expenses, for many of us have moved from our birthplaces, returned often to visit our relatives and friends, and intend to some day go back "home" to stay. Obviously this is not enough to entitle us to deduct all of our personal living expenses while "away from home." No doubt the petitioner believes, in all sincerity, that he regards El Paso as his "home." He spent most of his younger years there, his social and family contacts have been active and strong throughout the years, he has engaged in charitable works, maintained church and club memberships, and voted and borrowed money there. And now he owns a home in El Paso. We acknowledge that the petitioner has shown us a number of objective manifestations of his subjective intent to make El Paso his "home" during the years in question. But one very crucial thing is missing. The deduction was provided by Congress to ease the burden of the "traveling man" who incurs increased costs of living because he maintains a permanent home at one place while he incurs ordinary living costs at each place *97 he stops in pursuit of his business. Petitioner never bore this burden in the years before us. As the Court of Appeals explained in James, the burden exists only when the taxpayer has a "home," the maintenance of which involves substantial continuing expenses which will be duplicated by the expenditures which the taxpayer must make when required to travel elsewhere for business purposes. [Emphasis supplied.] This is a reasonable approach because it does not penalize the traveling man for the infrequency of his visits "home." Instead, it looks, to a large extent, at the degree and regularity of his cash expenditures there, recognizing that this is a pivotal and meaningful manifestation of where the traveling man's permanent abode is. This petitioner incurred his normal living expenses at each place he stayed. His wife was with him almost all the time and made his home wherever they happened to be. Much of his living expenses were reimbursed to him by his employer, including all expenses during his periodic visits to the home office of his employer in Chicago. Because of practical problems, Congress has allowed the deduction under section 162(a)(2) to apply to personal living *98 expenses while on the road once the taxpayer shows he is "away from home." Such limitation is logical since non-traveling taxpayers have no opportunity to pay personal living expenses with untaxed income. See section 262, Internal Revenue Code of 1954. Petitioner has shown us only one continuing living expense in El Paso, i.e., the $10 a month "rent" he voluntarily sent his sister-in-law each month. While the testimony with respect to these payments is conflicting, we believe they were intended to be nothing more than reimbursement for forwarding the petitioner's mail and trunk to him. However, assuming arguendo that the $10 checks were what they purported to be, it is our view that they did not represent a substantial continuing expense within the ambit of the James decision. It is true that petitioner paid his sister-in-law $20 to $25 a week during the few occasions he stayed with her and apparently paid an occasional household expense. But these were just the usual costs of living he would have incurred anywhere else he was staying, albeit lower because he was a guest in her home. Consequently, on this record we find that petitioner was not "away from home" *99 when he was away from El Paso. Alternatively, petitioner claims that his "tax home" is Chicago, the home office of his employer where he went periodically for meetings and from which location he received his assignments and paychecks. Suffice it to say that we do not regard Chicago as petitioner's permanent post of employment. See Mort L. Bixler, 5 B.T.A. 1181 (1927). His contacts there were minimal and sporadic. His post of employment and his home were wherever he might be. As we said in Charles E. Duncan, 17 B.T.A. 1088, 1091 (1929): But in our opinion the Congress did not intend to allow as deductions all the year's expenses for meals, lodging, laundry, etc., incurred by a taxpayer who maintained no permanent home, no definite headquarters; who traveled on a roving commission, with headquarters wherever he happened to be. Next the petitioner contends that, even if he was not "away from home" during the years involved, he is entitled to deduct the amounts expended by him while on business trips in excess of ordinary costs of living. He made some effort to prove that it cost him substantially more to live outside of El Paso than when he stayed in his *100 sister-in-law's home. However, his testimony was largely based on guesswork and suffered notably from lack of substantiation. Indeed, he has left too many questions open for speculation to justify our granting the relief he requests. For example: Were his costs of living at his sister-in-law's home "ordinary" costs of living? It is not unlikely they were lower. Since he received substantial reimbursements from his employer, how do we allocate them? Do we "gross-up" all his expenses of living before determining if the expenses were excessive? Do we eliminate all or some of the reimbursements since they represented untaxed amounts which were applied to ordinary living expenses? It is not unlikely that petitioner's unreimbursed out-of-pocket living expenses on the road were lower than normal living costs. In any event, the petitioner has failed to carry his burden of proof on this issue. Respondent concedes that if petitioner was not "away from home" when away from El Paso, then at least 31 percent of the automobile depreciation and operating expenses claimed by him should be allowed him as deductions. Petitioner concedes that at least 10 percent for 1960, 1961 and 1962 and 25 percent *101 for 1963 were for personal purposes. At issue is the tax treatment of the difference. Considering the evidence offered by petitioner, we think that application of the Cohan rule (39 F. 2d at p. 544) is appropriate. Using our best judgment, we conclude that 50 percent of the automobile depreciation and operating expenses should be allowed. Finally, our findings of fact are dispositive of the issue relating to the negligence penalty determined by respondent for the year 1960. Petitioner had the assistance of a certified public accountant in preparing his income tax return for that year and reasonably relied on his advice. Rhett W. Woody, 19 T.C. 350 (1952). Therefore, we hold for petitioner on this issue. Decisions will be entered under Rule 50. Footnotes
1. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; * * *↩